IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FAIR HOUSING COUNCIL OF OREGON, an Oregon nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>TRAVELERS HOME AND MARINE INSURANCE COMPANY, a foreign insurer; TRAVELERS INDEMNITY COMPANY OF AMERICA, a foreign insurer; PROGRESSIVE INSURANCE CORPORATION, INC., an Oregon corporation, d/b/a LLOYD PURDY & CO., an Oregon assumed business name,<br><br>Defendants. | Case No. 3:15-cv-00925-SB<br><br>**FINDINGS AND RECOMMENDATION** |

**BECKERMAN, Magistrate Judge.**

Plaintiff Fair Housing Council of Oregon ("FHCO"), a non-profit corporation, filed suit on May 28, 2015 against Defendants Travelers Home and Marine Insurance Company and Travelers Indemnity Company of America (collectively "Travelers")[1] and Defendant Progressive

---

[1] FHCO also filed suit against Travelers Casualty and Surety Company, Travelers Casualty and Surety Company of America, Travelers Casualty Insurance Company of America, Travelers Property Casualty Company of America, Travelers Property Casualty Insurance Company, Travelers Indemnity Company, and Travelers Casualty Company. The parties later

PAGE 1 – FINDINGS AND RECOMMENDATION

Insurance Corporation, Inc. ("Progressive"), seeking to enforce various provisions of the Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988 ("FHA"), 42 U.S.C. § 3601, *et seq.* (First Claim), and the comparable Oregon statute, ORS 659A.145 (Second Claim).[2]

FHCO has filed a Motion for Summary Judgment as to liability. (ECF No. 57.) Travelers has filed a Motion for Summary Judgment on the grounds that FHCO lacks Article III standing to bring this action. (ECF No. 81.) Progressive has joined Travelers' Motion for Summary Judgment, and also filed its own Motion for Summary Judgment on the merits. (ECF No. 86.) For the reasons that follow, the district judge should grant defendants' motions for summary judgment and deny FHCO's motion for summary judgment.

## BACKGROUND

FHCO is a non-profit organization whose goals include the "elimination of all forms of illegal housing discrimination" and "the promotion of equal opportunity in the renting, purchasing, financing, and advertising of housing." (Compl. ¶ 3.) To accomplish these goals, FHCO's activities include investigating reports of housing discrimination, conducting tests of housing facilities to determine compliance with fair housing laws, taking steps to counteract and eliminate discriminatory housing practices, and providing outreach and education to the community regarding fair housing. (*Id.*)

---

stipulated to the dismissal of all claims against these seven entities, as they did not write homeowners insurance in Oregon during the relevant time period. (*See* ECF Nos. 34 and 35.)

[2] Oregon's fair housing law mirrors federal fair housing law, and the Oregon statute is generally interpreted consistently with its federal counterpart. *Fishing Rock Owners' Ass'n v. Roberts*, 6 F. Supp. 3d 1132, 1138 n.1 (D. Or. 2014); *Fair Hous. Council of Or. v. Brookside Vill. Owners Ass'n*, No. 3:08-cv-3127-ST, 2012 WL 8017842, at *27 (D. Or. Oct. 19, 2012).

In recent years, FHCO has dramatically increased its enforcement activities. During the three-year period from June 30, 2011 through June 2014, FHCO's annual expenses for its enforcement programs rose from $7,955 to approximately $1,150,000, or roughly from 2% to 91% of its annual budget. (McGuire Dep. at 51:23-52:25; 56:9-67:19; McGuire Dep. Exs. 43, 44, 45, and 46.) During the same period, FHCO's expenditures for education and outreach decreased from approximately $361,519.93 to approximately $89,000. (*Id.*) FHCO's shift in focus from education and outreach to enforcement was primarily driven by the government grants it received. (McGuire Dep. at 67:20-22.)

As part of its enforcement efforts, FHCO uses testers to determine how persons and entities that are subject to fair housing laws treat members of protected classes. (Decl. of Pegge McGuire in Supp. of Pl.'s Mot. for Summ. J. ("McGuire Decl. I") ¶ 5.) Testers are persons who, without the intent to buy a house or purchase homeowners insurance, gather information about housing and homeowners insurance practices in order to determine whether discriminatory housing practices are occurring. (*Id.*)

In addition, FHCO regularly conducts fair housing training seminars for landlords throughout the state. (*Id.* ¶ 3.) At some of these seminars, landlords informed FHCO representatives that they had been told by their liability insurers that their policies would be canceled, or their premiums would be increased, if they allowed pit bulls on their property as assistance animals. (*Id.*)

FHCO decided to test companies that offer homeowners insurance in Oregon in order to determine if the companies with pit bulls on their breed restriction list would make exceptions to those policies if informed that the pit bull in question was an assistance animal. (*Id.* ¶¶ 4-5.)

Travelers sells homeowners insurance both directly and through independent agents such as Progressive. Prior to initiating testing, FHCO had not received any specific complaints regarding Travelers, but selected the company as a testing target because it understood that Travelers was one of the larger providers of homeowners insurance in the United States. (Bennett Dep. at 40:4-23.) FHCO designed tests in which each tester would call Travelers and pose as an individual who suffered from a disability and wished to use a pit bull as an assistance animal. (McGuire Decl. I ¶ 5.) FHCO conducted four such tests in this case, and bases its motion for summary judgment on the results of two of these tests.[3]

In the first such test, a tester called an employee of Progressive, an independent insurance agent that offers Travelers insurance through an agency contract with Travelers. (Tester Alpha Ex. 1 at 2; Progressive's Interrog. Resp. No. 1.) The tester asked for a quote for a Travelers homeowners insurance policy, and stated that he owned a pit bull as an assistance animal. (Tester Alpha Ex. 1 at 2.) The Progressive employee called a Travelers underwriter to ask if Travelers would make an exception to Travelers' breed restrictions. (*Id.*) The underwriter stated that Travelers would not make an exception, and the Progressive employee conveyed this to the tester. (*Id.*)

In the second test, a tester attempted to obtain an insurance quote directly from a representative of Travelers. (Tester Beta Ex. 1 at 2.) The tester stated that she owned a pit bull as an assistance animal, and Travelers declined to offer a quote for homeowners insurance because of the presence of a pit bull in the home. (*Id.*)

---

[3] In the other two tests, the parties appear to dispute whether the testers adequately disclosed the existence of a disability and requested a reasonable accommodation in such a way that would trigger the provisions of the FHA. (*Compare* ECF No. 74 at 11, *with* ECF No. 92 at 10 n.1.)

PAGE 4 – FINDINGS AND RECOMMENDATION

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. *Id.* at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### II. DISCUSSION

Both Travelers and Progressive seek summary judgment on the basis that FHCO has not established "injury in fact" sufficient to confer Article III standing to bring this action. To establish constitutional standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). Courts utilize the same analysis to determine standing for both individual and organizational plaintiffs. *La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). Plaintiff bears the burden of establishing standing, and because its standing is challenged at the summary judgment stage, plaintiff must set forth specific facts to show each of the elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884-85 (1990).

In order to satisfy the Article III requirement of injury in fact, a fair housing organization suing to enforce the provisions of the FHA must demonstrate more than merely a "setback to [its] abstract social interests," but rather a "concrete and demonstrable injury to the organization's activities" resulting in a "consequent drain on the organization's resources." *Havens*, 455 U.S. at 379. The Ninth Circuit has interpreted *Havens* to mean that "an organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (citing *Fair Hous. of Marin v. Combs* (*Combs II*), 285 F.3d 899, 905 (9th Cir. 2002)).

### A.    Frustration of Mission

Defendants claim that their conduct could not have frustrated FHCO's mission of eliminating housing discrimination because FHCO explicitly advances this mission through enforcement activities, which consume over 90% of FHCO's resources. (McGuire Dep. at 67.) Defendants argue that FHCO's enforcement activities cannot simultaneously advance and frustrate its mission at the same time.

While defendants' position is appealing at first blush,[4] it does not accurately reflect the state of the law in the Ninth Circuit. In *Havens*, the Supreme Court found organizational standing where a fair housing organization alleged that its mission was to "assist equal access to housing through counseling and other referral services," and that defendant's discriminatory housing

---

[4] Indeed, Judge Ikuta's persuasive dissent in *Fair Hous. Council of San Francisco Valley v. Roomate.com*, 666 F.3d 1216 (9th Cir. 2012) advances a similar argument, noting that while the Ninth Circuit has held that "an organization with a social interest in advancing enforcement of a law [is] injured when the organization spen[ds] money enforcing that law," this injury "looks suspiciously like a harm that is simply 'a setback to the organization's abstract social interests,'" the very thing the Supreme Court has held to be insufficient to establish injury in fact. *Id.* at 1226 (quoting *Havens*, 455 U.S. at 379).

practices had "impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income home-seekers." *Havens*, 455 U.S. at 379. The Ninth Circuit, however, has significantly relaxed this prong of the organizational standing analysis, and has held that "[a]ny violation of the FHAA" by definition frustrates the mission of a fair housing organization whose goals include the elimination of housing discrimination. *Smith*, 358 F.3d at 1105.

FHCO's organizational goals include the "elimination of all forms of illegal housing discrimination" and "the promotion of equal opportunity in the renting, purchasing, financing, and advertising of housing." (Compl. ¶ 3.) FHCO alleges that defendants have violated the FHA by, *inter alia*, refusing to waive Travelers' breed restriction policy when necessary to provide a reasonable accommodation to purportedly disabled testers. (*Id.* ¶ 25.) These allegations satisfy the "frustration of mission" requirement for organizational standing as set forth in this Circuit.

### B.   Diversion of Resources

In addition to demonstrating a frustration of its mission, plaintiff must also establish that defendants' actions required it to divert resources that it would have spent in other ways. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F3d 936, 943 (9th Cir 2011).

FHCO alleges that it has been forced to divert resources toward several different types of expenditures, all of which can be grouped into two categories: testing costs (including training and compensating testers, paying for staff time to develop and analyze tests, and diversion of staff time from other activities to testing-related activities) and anticipated future expenses (including anticipated remedial outreach and education efforts, and future monitoring of defendants' actions). (McGuire Decl. I ¶¶ 7-9; Decl. of Pegge McGuire in Supp. of Pl.'s Resp. to Travelers Defs.' Mot. for Summ. J. ("McGuire Decl. II") ¶¶ 4-6.)

PAGE 7 – FINDINGS AND RECOMMENDATION

Defendants contend that plaintiff's testing costs are actually "litigation costs," and therefore excluded from consideration in the Court's standing analysis. Furthermore, defendants argue that FHCO's "anticipated" future spending is too speculative and remote to confer Article III standing. The Court agrees.

### 1. Testing Costs

Plaintiff alleges that its resources have been diverted to the cost of training and compensating testers, paying for staff time to develop and analyze tests, and diverting staff time from other activities to testing-related activities. (McGuire Decl. I ¶¶ 7-9.) Put another way, plaintiff claims that it has diverted its resources in order to test defendants to determine their compliance with the FHA and gather evidence of FHA violations regarding pit bull service animals.

Defendants argue that these testing costs should be excluded from the Court's standing analysis because they are actually "litigation costs." The Ninth Circuit has followed the Third Circuit, Fifth Circuit, and the D.C. Circuit in ruling that a "diversion of resources" toward litigation expenses cannot establish Article III standing. Redondo Beach, 657 F.3d at 943 ("[S]tanding must be established independent of the lawsuit filed by the plaintiff."); La Asociacion De Trabajadores, 624 F.3d at 1088 (holding that an organization "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.").

While the Ninth Circuit has not explicitly analyzed what constitutes "litigation costs" in this context, the D.C. Circuit has addressed the issue at length. In Fair Emp't Council of Greater Washington v. BMC Mktg., 28 F.3d 1268 (D.C. Cir. 1994), the D.C. Circuit "explicitly reject[ed] the . . . suggestion that the mere expense of testing [a defendant] constitutes 'injury in fact' fairly traceable to [defendant's] conduct." Id. at 1276. The D.C. Circuit went on to explain that a fair

PAGE 8 – FINDINGS AND RECOMMENDATION

housing organization's diversion of resources in order to test a defendant was a "self-inflicted" injury and could not confer Article III standing. *Id.* at 1277. It is worth noting here that the Ninth Circuit has not only expressly followed the D.C. Circuit in concluding litigation costs do not confer standing on an organizational plaintiff, but also specifically cited *BMC* when it noted that "the law of [the D.C. Circuit] is not different from the law" applied by the Ninth Circuit in determining standing under the FHA. *Combs II*, 285 F.3d at 903-904. The D.C. Circuit has since elaborated that the critical question when examining a plaintiff's purported diversion of resources is "whether they undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination, rather than in anticipation of litigation." *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). A "diversion of resources to litigation *or investigation in anticipation of litigation* does not constitute an injury in fact sufficient to support standing . . . ." *Id.* (emphasis added) (citing *BMC*, 28 F.3d at 1276-77).

Under this rule, FHCO's testing costs cannot support Article III standing. This is particularly true given that plaintiff appears to have conceded that its testing of defendants was conducted exclusively for litigation purposes.

On May 3, 2016, Travelers moved to compel FHCO to produce the names of all insurance companies on which FHCO conducted the same or similar testing regarding insurance applicants with pit bull assistance animals, all documents related to such testing, and all documents related to any other issue testing that FHCO conducted against Travelers.[5] (ECF No. 51.) While litigating the motion to compel, plaintiff repeatedly averred that its testing was conducted in anticipation of litigation and vigorously disputed the notion that FHCO's testing in this case was performed for any purpose *other* than litigation. (ECF No. 54 at 7) ("The

---

[5] On July 18, 2016, the Court denied this motion as moot, in light of the pending motions for summary judgment filed by the parties. (ECF No. 90.)

PAGE 9 – FINDINGS AND RECOMMENDATION

documents related to testing of other insurance companies and other testing of the Travelers Defendants were prepared because of the prospect of litigation. . . . Simply put, if Plaintiff was not considering pursuing litigation against the test subject, the documents [relating to testing] would not exist.").

These arguments were supported by the sworn deposition testimony of plaintiff's Enforcement Coordinator, Malia Bennett, who testified that although plaintiff sometimes utilizes testing data to informally approach a housing provider in lieu of filing a complaint, no such informal resolution was ever considered with regard to plaintiff's testing on the issue of pit bull service animals. (Bennett Dep. at 202:10-203:11) (plaintiff did not consider informal resolution because it "believed that filing a case would be the most impactful, efficient way to address the issue").

Given these concessions, plaintiff's testing was not merely "investigation in anticipation of litigation," *Equal Rights Ctr.*, 633 F.3d at 1140, but investigation *exclusively* for the purpose of litigation, and therefore must be excluded from the standing analysis under *Equal Rights Center*.

In response, FHCO urges the Court to disregard *Equal Rights Center* and to focus instead on two cases that it claims stand for the proposition that testing costs can confer Article III standing: *Combs II*, 285 F.3d 899 and *Fair Hous. Council of Or. v. Brookside Vill. Owners Ass'n*, No. 3:08-cv-3127-ST, 2012 WL 8017842 (D. Or. Oct. 19, 2012). FHCO argues that the categories of damages claimed in *Combs* "are identical to the categories of damages claimed by FHCO," are not litigation costs, and are "damages that give the organization standing to bring a claim under the FHA." (Pl.'s Supp. Br. at 4.) This analysis does not survive closer scrutiny.

PAGE 10 – FINDINGS AND RECOMMENDATION

An initial obstacle to plaintiff's efforts to distinguish between the Ninth Circuit's reasoning in *Combs II* and the standing analysis outlined by the D.C. Circuit is that *Combs II* itself explicitly cites the D.C. Circuit's decision in *BMC* when noting that "the law of [the D.C. Circuit] is not different" from the law applied by the Ninth Circuit in determining standing under the FHA. *Combs II*, 285 F.3d at 903-04. As previously noted, *BMC* "explicitly reject[ed] the . . . suggestion that the mere expense of testing [a defendant] constitutes 'injury in fact' fairly traceable to [defendant's] conduct." 28 F.3d at 1276.

But there is a more serious flaw in plaintiff's argument. The Ninth Circuit held that the plaintiff in *Combs II* had standing because its resources were diverted above and beyond litigation costs. The Court went on to note that the district court had awarded $14,217 for diversion of resources and $10,217 for frustration of mission damages. 285 F.3d at 905. These amounts represent all damages won by plaintiff in the district court—not, as FHCO claims, a list of the "damages that gave the organization standing to bring a claim under the FHA." (Pl.'s Supp. Br. at 4.) Indeed, the $14,217 awarded by the district court for diversion of resources explicitly included litigation costs, which plainly cannot confer standing. *Fair Hous. of Marin v. Combs* (*Combs I*), No. C97-1247, 2000 WL 365029, at *3 (N.D. Cal. Apr. 3, 2000) (diversion of resources damages include $12,179 for "the cost of [plaintiff organization] worker time in investigating *and litigating*" the case, as well as attorney "fees and costs") (emphasis added). In other words, the simple fact that the plaintiff in *Combs* was awarded compensation for four categories of "diversion of resources" damages does not automatically mean that each of these four damage categories is sufficient to confer Article III standing.[6]

---

[6] The Ninth Circuit does not mention the various damage categories awarded by the district court for "diversion of resources," let alone discuss which of these damages qualify as litigation costs, and which do not. *See Combs II*, 285 F.3d at 905.

PAGE 11 – FINDINGS AND RECOMMENDATION

FHCO claims that its alleged damages are "identical" to those in *Combs*, but this is incorrect. The plaintiff in *Combs* alleged—and was awarded—diversion of resources damages for $1,140 that it had *already spent* participating on the Marin County Board of Supervisors' Task Force on Housing Discrimination in order to address defendant's housing practices.[7] *Combs I*, 2000 WL 365029, at *3. Education and outreach programs such as this are clearly not associated with litigation, and courts have previously found standing where plaintiffs establish that a defendant's actions forced a diversion of resources toward such programs. *See, e.g.*, *Roomate.com*, 666 F.3d 1216 at 1219 (finding standing where, prior to commencing litigation, plaintiffs "started new education and outreach campaigns targeted at discriminatory roommate advertising" in response to defendant's alleged violations). FHCO, however, has not established any such pre-litigation diversion of resources, but instead argues that it plans to spend money on remedial outreach, education, and monitoring *in the future*. As the Court explains below, *see infra* Part II.B.2, this is a critical distinction.

FHCO also relies on the fact that it was previously found to have standing in fair housing litigation several years ago when it alleged similar damages. *See Brookside*, 2012 WL 8017842. Unlike *Combs II*, the Court in *Brookside* specifically addressed the question of whether testing expenses should be considered in determining injury in fact for Article III standing. *Brookside* ultimately concluded that "time and money spent investigating potential discrimination do not negate standing simply because they relate to the development of a lawsuit. They also can be regarded as an independent activity associated with the identification and counteraction of the defendants' discriminatory practices." 2012 WL 8017842, at *13. While this logic might be true

---

[7] The district court declined to award damages for plaintiff's participation on a second committee because it found that defendant had not been shown to be the "but for" cause of those expenses. *Combs I*, 2000 WL 365029, at *3.

in the abstract, it is inapplicable where plaintiff admits that the time and money it spent investigating defendants was *exclusively* for the purpose of litigation. *See supra* at 9-10. On these facts, plaintiff's testing costs cannot be regarded as an "independent activity" separate from litigation costs, and accordingly do not represent sufficient "injury in fact" to confer Article III standing.

### 2.     Future Outreach, Education, and Monitoring

The only other damages FHCO claims beyond testing costs are anticipated future expenses, including anticipated remedial outreach and education seminars, as well as anticipated future monitoring of defendants' actions. (McGuire Decl. II ¶¶ 5-6.)

In order to demonstrate Article III standing, a plaintiff must establish injury in fact that is both "concrete and particularized" and "actual or imminent" at the time it filed suit. *Defenders of Wildlife*, 504 U.S. at 560. A threatened injury that has not yet occurred at the time of filing "must be certainly impending to constitute injury in fact," and "'[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Here, FHCO has not alleged that it has already been forced to divert its resources toward remedial outreach, education, and monitoring efforts, but rather than it "anticipates" doing so on some unspecified future date. (Pl.'s Opp. to Travelers' Mot. for Summ. J. at 11; McGuire Decl. II ¶¶ 5-6.) Therefore, FHCO must set forth specific facts demonstrating that these anticipated future expenses constitute an injury in fact that was "actual or imminent" at the time it filed suit. *Defenders of Wildlife*, 504 U.S. at 560.

As an initial matter, FHCO has suggested that it is unnecessary to establish whether its planned future expenses were "imminent" or "certainly impending" at the time it filed suit, because the "injury in fact" that these expenses are designed to remedy—defendants' alleged

PAGE 13 – FINDINGS AND RECOMMENDATION

discrimination—has already occurred.[8] The problem with this argument is that the housing discrimination *itself* is precisely the type of "setback to [plaintiff's] abstract social interests" that the Supreme Court has held does not confer standing. *Havens*, 455 U.S. at 379. Under *Havens* and its progeny, the "injury in fact" that plaintiff must allege and prove to establish standing is a diversion of the organization's resources. It is this diversion of resources—not defendants' discrimination—that must be "actual or imminent" before plaintiff has standing under Article III.

Despite having the burden to establish standing, plaintiff has identified no evidence in the record suggesting that these planned future expenses were "actual or imminent" when it filed suit nearly 18 months ago. Instead, FHCO cites two cases as examples where (1) damages for "future planned activities" were alleged; and (2) the court found that plaintiff's resources had been diverted. (Pl.'s Opp. to Travelers' Mot. for Summ. J. at 14) (citing *Brookside*, 2012 WL 8017842, at *13; *Combs II* 285 F.3d at 905; and *Combs I*, 2000 WL 365029, at *4).

FHCO reads too much into these cases: just because the court ultimately found standing in a case where plaintiffs alleged damages for future expenses does not mean that the court found standing *because* of this type of "anticipated future spending." Both *Combs* and *Brookside* are silent on the issue of whether future planned expenses are sufficiently "actual," "imminent," or "certainly impending" as required by Article III. *Defenders of Wildlife*, 504 U.S. at 560; *Clapper*, 133 S. Ct. at 1147. As defendants correctly note, in both *Combs* and *Brookside*, the courts found that the plaintiffs' resources had already been diverted, giving the court in each case an independent basis to find injury in fact.[9] *Brookside*, 2012 WL 8017842, at *13 (noting that

---

[8] At oral argument, FHCO analogized its situation to that of an accident victim, who suffers a redressable injury at the moment of collision even if he has not yet paid for car repairs at the time he files suit.

[9] Indeed, *Combs II* explicitly categorizes the damages for plaintiff's envisioned future outreach as compensation for "frustration of mission," and these costs were not counted (by

PAGE 14 – FINDINGS AND RECOMMENDATION

plaintiff's "past diversion of resources" totaled $4,229); *Combs I*, 2000 WL 365029, at *3 (awarding $12,179 in past diversion of resources damages, including $1,140 in non-testing, non-litigation costs).

In short, FHCO asks this Court to conclude that FHCO's plans for future action on some unspecified future date[10] are sufficient to establish injury in fact. Neither *Combs II* nor *Brookside* compel such a result, and this Court finds that FHCO has failed to meet its burden to establish that these expenses were "actual or imminent" at the time it filed suit. *Clapper*, 133 S. Ct. at 1147 (noting that "[a]llegations of possible future injury are not sufficient" to confer Article III standing) (internal citation omitted); *accord Equal Rights Ctr.*, 633 F.3d at 1141-42 (holding that plaintiff's proposed future testing and monitoring programs were insufficient to confer standing where plaintiff made no showing that implementation of the program was "actual or imminent" when the complaint was filed); *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1988) ("[I]nchoate plans for future programs are insufficient to demonstrate injury for purposes of Article III.").

## CONCLUSION

"[A]n organization cannot . . . manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit . . . ." *Combs II*, 285 F.3d at 905 (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (Ginsburg, J.)). Unfortunately, it appears that this is what FHCO has done under the somewhat unique facts of this case. Because FHCO

---

either the district court or the Ninth Circuit) as a "diversion of resources" for standing purposes. *See Combs II* 285 F.3d at 905; *Combs I*, 2000 WL 365029, at *4.

[10] Although FHCO's testing concluded over two years ago, it admits that it has yet to undertake any of its planned outreach, education, or monitoring programs.

PAGE 15 – FINDINGS AND RECOMMENDATION

has not established an "actual or imminent" diversion of resources to activities other than litigation, it lacks standing under Article III to bring this particular action.

The Court therefore recommends that the district judge GRANT Defendants' Motions for Summary Judgment (ECF Nos. 84 and 86), and that the district judge DENY Plaintiff's Motion for Partial Summary Judgment (ECF No. 57). The Court further recommends that the district judge enter a Judgment dismissing all claims against defendants.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this _2_ day of December, 2016.

*Stacie F. Beckerman*

STACIE F. BECKERMAN
United States Magistrate Judge